**PAYMASTER TECHNOLOGIES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 01–33C.

United States Court of Federal Claims.

Nov. 26, 2002.

Paul L. Brown, Emrich & Dithmar, Chicago, IL, for plaintiff. Ronald R. Snider, Snider & Associates, Washington, DC, of counsel.

Robert G. Hilton, Washington, DC, with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant. John J. Fargo, Department of Justice, of counsel.

### OPINION

MILLER, Judge.

Plaintiff brings suit against the United States under 28 U.S.C. § 1498 (2002), for infringement of U.S. Patent No. 5,292,283, entitled "Money Order Imprinter." The parties have briefed the construction of the claims, and a hearing on claim construction has been held.[1]

### FACTS

Paymaster Technologies, Inc. ("plaintiff"), seeks compensation from the United States based on the use by the United States Postal Service (the "USPS") of two types of money order form sets that it alleges are disclosed and claimed by U.S. Patent No. 5,292,283 (issued Mar. 8, 1994) ("the '283 patent"). The exact definition of a form set is in dispute. For the sake of clarity, and without construing the term, a form set is, in its most general terms, a slip or slips of paper that the USPS uses in an imprinting machine to print monetary instruments. The '283 patent teaches a type of form set for use with an imprinting apparatus for imprinting indicia with a dye-based ink. The form set is comprised of an absorbing-type paper which absorbs the ink, providing a security feature for the instrument.

The accused products are two types of form sets, which differ from each other in that they contain a different number of sheets. The first accused product is a three-part form set (including a money order instrument sheet, an intermediate voucher sheet, and a lower customer receipt sheet); the second accused product contains only two

---

1. The hearing in this case is denominated more accurately as an oral argument because no witnesses testified, although exhibits were received.

parts (a money order instrument sheet and a customer receipt).

Plaintiff acquired the '283 patent from the Paymaster Corporation, which was the original assignee of the '283 patent. The '283 patent arose out of another patent, U.S. Patent No. 4,995,315 (issued Feb. 26, 1991) ("the '315 patent"). The original application for patent '315 claimed an imprinting apparatus, an inked ribbon cartridge, and a form for use with the apparatus and ink ribbon. During the prosecution of the '315 patent, the U.S. Patent and Trademark Office (the "PTO") requested that the applicant restrict the '315 patent to the imprinting apparatus. As a result, Paymaster Corporation filed a divisional application claiming the inked ribbon cartridge, which matured as U.S. Patent No. 5,086,697 (issued Feb. 11, 1992). Paymaster Corporation also filed a divisional application claiming the form set for use with an imprinting apparatus, which matured as the patent-in-suit, the '283 patent.

## DISCUSSION

### I. Standards for claim construction

Determination of claim construction is a matter of law for the court to decide. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970–71 (Fed.Cir.1995) (*en banc*), *aff'd,* 517 U.S. 370, 372, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The Federal Circuit has held that when construing a claim, a court should look first to the intrinsic evidence, *i.e.,* the claims themselves, the written description in the patent's specification, and the patent's prosecution history. *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.,* 132 F.3d 701, 705 (Fed.Cir.1997).

"The starting point for any claim construction must be the claims themselves." *Pitney Bowes, Inc. v. Hewlett–Packard Co.,* 182 F.3d 1298, 1305 (Fed.Cir.1999); *see also Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). The court indulges a "heavy presumption that a claim term carries its ordinary and customary meaning." *CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed.Cir.2002). The court's precedents indicate that dictionary definitions may establish a claim term's ordinary meaning. *Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336, 1344 (Fed.Cir.2001).

However, the law allows a patentee to "choose to be his or her own lexicographer by clearly setting forth an explicit definition for a claim term that could differ in scope from that which would be afforded by its ordinary meaning." *Rexnord Corp.,* 274 F.3d at 1342. Thus, "[i]t is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Northern Telecom, Ltd. v. Samsung Electronics Co., Ltd.,* 215 F.3d 1281, 1293 (Fed.Cir.2000) (quoting *Vitronics Corp.,* 90 F.3d at 1582). "The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Vitronics Corp.,* 90 F.3d at 1582. In addition, "[t]he prosecution history is often helpful in understanding the intended meaning as well as the scope of technical terms, and to establish whether any aspect thereof was restricted for purposes of patentability." *Vivid Techs., Inc. v. American Sci. & Eng'g, Inc.,* 200 F.3d 795, 804 (Fed.Cir. 1999). Therefore, "the claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history." *CCS Fitness,* 288 F.3d at 1366. Thus, when the intrinsic record shows that the specification uses a word or words in a manner inconsistent with their ordinary meaning, "the inconsistent dictionary definition must be rejected." *Texas Digital Sys., Inc. v. Telegenix,* 308 F.3d 1193, 1203 (Fed. Cir.2002).

In construing a claim, the court must take the viewpoint of a person having ordinary skill in the art at the time of the invention, *North Am. Vaccine, Inc. v. Am. Cyanamid Co.,* 7 F.3d 1571, 1579 (Fed.Cir. 1993), *viz.,* "[i]t is the person of ordinary skill in the field of the invention through whose eyes the claims are construed." *Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1477 (Fed.Cir.1998). In the case at bar, the court must place itself in the shoes of a person of ordinary skill engaged in the art of designing imprinting apparatuses, and

the operation of imprinting indicia onto a negotiable instrument, the art of pigment and ink characteristics, the art of security document alteration, and the art of security-grade papers and their absorption characteristics at the time the invention was made, circa 1985–1992. In using the standard of persons skilled in the art, a court must weigh such evidence against a "heavy presumption" that a claim term carries its ordinary and customary meaning. *CCS Fitness*, 288 F.3d at 1366.

After considering intrinsic evidence, the court also may consult trustworthy extrinsic evidence, such as expert testimony or prior art proffered by one of the parties. *Pitney Bowes*, 182 F.3d at 1309; *Vitronics*, 90 F.3d at 1584. The court should use extrinsic evidence to ensure that the claim construction is not inconsistent with the "clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Pitney Bowes*, 182 F.3d at 1309. Evidence extrinsic to the claim language, specification, and prosecution history may be used only to the extent that the claims, specification, and prosecution history are ambiguous. *Vitronics*, 90 F.3d at 1584. Extrinsic evidence may not be used to contradict the claim language. *Vitronics*, 90 F.3d at 1584–85; *Markman*, 52 F.3d at 981.

Dictionary definitions are extrinsic evidence, in that they are not part of an integrated patent document; however "judges are free to consult such resources at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Vitronics*, 90 F.3d at 1584 n. 6. Thus, "categorizing [dictionaries, encyclopedias and treatises] as 'extrinsic evidence' or even a 'special form of extrinsic evidence' is misplaced and does not inform the analysis." *Texas Digital*, 308 F.3d at 1203. However, the Federal Circuit has held that consulting the patent materials as a threshold step in the claim construction process, before discerning the ordinary meaning of claim terms, "invites a violation of our precedent counseling against importing limitations into the claims." *Id.* at 1204.

## II.  *Claim terms in dispute*

The parties advise that the following terms are in dispute: (1) form set; (2) negotiable instrument; and (3) character perimeter surface.[2]

The claims in question are claims 1, 5, 6, and 10. They contain the following limitations:

We claim:

1. A *form set* for use with apparatus used for imprinting indicia on *negotiable instruments*, said form set comprising:

an upper negotiable instrument sheet having a printed front surface and a back surface and comprised of an absorbing type paper sheet material for absorbing dye-based ink to permit the permeation of dye-based ink through said sheet from its printed front surface to its back surface to provide on its back surface a mirror image of the image imprinted on said printed front surface,

a lower customer receipt sheet,

an intermediate voucher sheet positioned between said upper negotiable instrument sheet and said lower customer receipt sheet,

a first transfer medium positioned between said upper negotiable instrument sheet and said intermediate voucher sheet, and

a second transfer medium positioned between said lower customer receipt sheet and said intermediate voucher sheet, said first transfer medium and second transfer medium each comprising an optical character recognition grade carbon sheet to provide optical character recognition indicia on said intermediate vouch-

2. The briefs also discuss two additional terms, "ribbon bearing dye-based ink" and "dye-based ink permeation." At the *Markman* hearing, the parties agreed that the former was not disputed and that the latter was an infringement issue, not a claim construction issue. The court will therefore reserve the discussion concerning "dye-based ink permeation" for subsequent proceedings addressing the question of infringement.

er sheet and said lower customer receipt sheet.

. . . .

5. A *form set* for use with an apparatus used for imprinting indicia with dye-based ink on *negotiable instruments,* said form set comprising:

an upper negotiable instrument sheet having a front printed surface and a back surface and comprised of an absorbing type paper sheet material for absorbing dye-based ink *whereby when the form set is impacted by the imprinting mechanism of the apparatus, the dye-based ink permeates through said upper sheet from said printed front surface to said back surface to provide the indicia in mirror image form on said back surface,*

a lower customer receipt sheet,

an intermediate voucher sheet positioned between said upper negotiable instrument sheet and said lower customer receipt sheet,

a first transfer medium positioned between said upper negotiable sheet and said intermediate voucher sheet,

a second transfer medium positioned between said lower customer sheet and said intermediate voucher sheet,

said first transfer medium and second transfer medium each comprising an optical character recognition grade carbon sheet,

said upper negotiable instrument sheet having at least first and second indicia receiving areas on its front surface, said first indicia receiving area including at least one field for receiving indicia indicative of the dollar and cents amount for which the negotiable instrument is drawn, and said second indicia receiving area including a field for receiving indicia indicative of the dollar and cents amount for which the negotiable instrument is drawn with said first indicia receiving area receiving indicia in a format readable by optical character recognition apparatus and said second indica [sic] receiving area receiving indicia in conventional arabic format, said second area being aligned with said first are

[sic] such that digits representing dollar and cents amount in said second field are aligned in the same plane as digits representing the corresponding dollar and cents amount in said first field to provide a tamper proof form set.

6. A form set according to claim 5 wherein the *total character face lateral migration* of the indicia from any character perimeter surface on either surface of the upper *negotiable instrument* sheet being no greater than about 0.012 inches.

. . . .

10. A *form set* for use with an apparatus having *an imprinting mechanism* including a *ribbon bearing dye-based ink* for imprinting *negotiable instruments* with characters indicative of the dollar and cents amount for which the *negotiable instrument* is *drawn,* each of said characters having a *character perimeter surface,* said form set comprising:

at least one negotiable instrument sheet comprised of an absorbing type paper sheet material for absorbing the dye-based ink *whereby when the form set is impacted by the imprinting mechanism of the apparatus, the dye-based ink permeates through the sheet from said printed front surface to said back surface* to provide the indicia in mirror image form on said back surface, the *total character face lateral migration* of the ink from any *character perimeter surface* on either surface of the sheet being no greater than about 0.012 inches.

'283 patent (emphasis added), col. 16, ll. 24—col. 18, ll. 22.

### 1. *"Form set"*

■ The parties dispute the meaning of the term "form set" as used in claim 10. Defendant contends that the "form set" limitation in claim 10 does not cover so-called single-ply forms. According to defendant, the claim to a "form set" is strictly limited to the three-part set described in claims 1 and 5, including a money order instrument sheet, a voucher sheet, and a customer receipt sheet. Plaintiff agrees that claims 1 and 5 require the three-part form set, but argues

that claim 10 does not. Plaintiff contends that claim 10 is an independent claim and that it defines form set to include single-ply instruments.

Claims 1 and 5 describe a form set comprised of "an upper negotiable instrument sheet ... a lower customer receipt sheet ... [and] an intermediate voucher sheet." '283 patent, col. 16, ll. 28, 36–37 and col. 16, ll. 63, col. 17, ll. 4–5. Claim 10 describes a "form set" as having "at least one negotiable instrument sheet comprised of an absorbing type paper sheet material for absorbing the dye-based ink ...." '283 patent, col. 18, ll. 12–14.

The plain language of claim 10 of the '283 patent supports plaintiff's reading of the patent claim. Claim 10 discloses a form set that is comprised of one or more sheets, but does not require that a form set have more than one sheet. Although claims 1 and 5 disclose a three-part form set, claim 10 is an independent claim and therefore is not beholden to the definition of "form set" as it is used in the previous claims.

The '315 patent specification also discloses a form set that includes single-ply sheets. According to the specification, the imprinting apparatus is designed to print "checks, money orders, or other negotiable instruments." '315 patent, col. 3, ll. 47–48. Because checks are single-ply security documents, and because they are negotiable instruments, *see infra* section 2, claim 10 of the '283 patent includes negotiable instruments comprised of single-ply sheets.

Defendant points out that the specification defines "form set" as being "comprised of a plurality of sheets, including a top or upper sheet ... a bottom sheet ... and at least one intermediate sheet ...." '283 patent, col. 7, ll. 17–22. However, this language is not dispositive for two reasons. First, the Federal Circuit has recognized the claim language itself is the primary source of a claim meaning. Even though several types of evidence are deemed intrinsic, a hierarchy of authority is present in the category of intrinsic evidence. Thus, the Federal Circuit has held that the actual words of the claim control over the specification or prosecution history. *See Thermalloy Inc. v. Aavid Eng'g, Inc.*, 121 F.3d 691, 692–93 (Fed.Cir.1997);

*see also Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1371 (Fed.Cir.2002) ("[L]imitations from elsewhere in the specification will not be read in where, as here, the claim terms are clear."). In the case at bar, the claim language explicitly states that a form set must have "at least one negotiable instrument sheet," but does not require more.

Second, defendant tries to use the specification to limit the claim language. The Federal Circuit has held however, that "[w]hile ... claims are to be interpreted in light of the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be read into the claims." *Sjolund v. Musland*, 847 F.2d 1573, 1581 (Fed.Cir.1988) (*cited in Prochroma v. United States*, 46 Fed.Cl. 750, 755 (2000)). Thus the specification cannot be used to limit the disclosure in a claim when the claim language carries a plain meaning.

Defendant rejoins that the plain meaning of the term "form set" requires two or more sheets, placed one under the other, with identical printing on each sheet. The language of claim 10 requires that the form set contain at least one negotiable instrument sheet that meets the requirements of lateral migration and permeation, but, per defendant, it does not contradict the requirement that a form set include at least two sheets. In effect, defendant argues that the sheets of paper are not a "set" simply because they are separable in two. To be a set, defendant contends, the sheets must also be of the same kind, beyond containing the same kind of fiber and ink. Defendant colorfully accuses plaintiff of attempting to create twins by dividing a baby. *See* Def.'s Br. filed Aug. 21, 2002, at 31–32.

To support its reading of the claim, defendant relies on extrinsic evidence, referring to *Webster's Ninth New Collegiate Dictionary* 1077 (9th ed.1985), and *American Heritage Dictionary* 1122 (2d ed.1982), which define a set as "more than one thing of the same kind." Further, defendant notes that if a patentee redefines a word in a claim, the specification must clearly indicate the redefinition. *Bell Atl. Network Servs., Inc. v. Co-*

*vad Communs. Group, Inc.*, 262 F.3d 1258, 1268 (Fed.Cir.2001). The ordinary meaning expressed in the dictionary definition controls how a term is construed, unless the intrinsic evidence clearly redefines the claim term so as to put one reasonably skilled in the relevant art on notice that plaintiff intended to assign the term a different meaning. *See id.* ("We have previously held that, in redefining the meaning of particular claim terms away from the ordinary meaning, the intrinsic evidence must 'clearly set forth' or 'clearly redefine' a claim term so as to put one reasonably skilled in the art on notice that the patentee intended to so redefine the claim term." (citation omitted)).

In the case at bar, the intrinsic evidence displaces the ordinary meaning of the claim term "form set," as used in claim 10. Both the plain meaning of claim 10 and the specification redefine the term to include form sets with only one sheet. Although the court agrees with defendant's proffered definition of "set" as that which connotes "more than one thing of the same kind," the court holds that the patentee has redefined that term in the given claim. *See Rexnord Corp.*, 274 F.3d at 1342 (holding that patentee can choose to be his or her own lexicographer); *Texas Digital*, 308 F.3d at 1203 (holding that presumption in favor of dictionary definition will be overcome where patentee, acting as his or her own lexicographer, has clearly set forth definition of term different from its ordinary meaning).

Defendant attempts to distinguish between the number of sheets required and the type of at least one sheet required by the claim, but has provided no textual basis upon which to ground such a reading. Defendant's interpretation of the term "form set" is not consistent with both the plain language of the claim and the specification. The patentee specifically has redefined the term "form set" as it is used in claim 10 and dependent claims, and the court will not reform that definition by reference to a dictionary.

Defendant also relies on the prosecution history of the '283 patent to support its reading of the claim. Defendant notes that the phrase "form set" did not appear in the '283 patent application (patent application USSN 623,035 ["the '035 application"], which matured into the patent-in-suit); the application used only the term "form." When the '283 patent was filed, plaintiff substituted "form set" for "form" in all claims. The PTO twice rejected the claims of the '035 application based on prior art, on July 29, 1991, and April 5, 1993, respectively. After the first rejection, the applicants of the '035 application met with the PTO on October 18, 1991, and the PTO identified U.S. Patent No. 1,727,912 ("Snyder") as prior art. Among other things, Snyder discloses a single-ply form set. Defendant therefore concludes that subsequent changes to the '035 patent application were made in reaction to that particular aspect of Snyder. Snyder, col. 1, ll. 1–21.

The prosecution history, in fact, reveals that the aspect of Snyder that constituted prior art was the amount fields on the check, not its form as a single-ply instrument. Before the October 18 meeting, a July 29, 1991 PTO report rejected patentee's claims 36 and 37 under 35 U.S.C. § 102(b) as anticipated by Snyder. The report goes on to note that "there are obviously multiple 'amount fields' on the Snyder check." Although the PTO disallowed the '283 patent application citing Snyder as prior art, the PTO did not cite Snyder's claim of single-sheet forms as the disclosure that precluded the '283 patent application and, in fact, cited another feature of Snyder. Thus, the prior art for which the '283 patent application was rejected was not the single-ply form of the imprinted instrument.

After the PTO meeting, the applicants made several changes to the '035 application, introducing such terms as "character face," "perimeter," "character perimeter surface," and "lateral migration," as well as using only the term "form set" instead of the term "form" in the claims. The patent application also added specification passages addressing the dye-based ink, the character perimeter surface, and the character face lateral migration. On April 5, 1993, the PTO again rejected the '283 patent application on the basis of prior art, U.S. Patent No. 4,846,502 (issued Jul. 11, 1989) ("Chang"). The applicants responded by an Amendment mailed

on August 4, 1993, stating that Chang is silent about the character face lateral migration of the ink, adding: "Plainly, the unique and novel purpose of the present invention is the disclosure of a negotiable instrument sheet comprised of an absorbing type paper sheet material for absorbing dye-based ink whereby when the form set is impacted by the printing mechanism, the dye-based ink permeates through the sheet from the printed front surface to the back surface to provide indicia in mirror image form." '283 Application, Paper No. 8a at 8. Subsequently, the '283 patent was allowed.[3]

The '283 patent's prosecution history does not support defendant's reading of the claim. The unique feature of the '283 patent application was the ink migration and character perimeter surface, as distinguished from Chang. It does not follow that the form set in the '283 patent necessarily must be comprised of multiple sheets. Indeed, applicant's statement quoted above indicates that the number of sheets in the form set was not the unique feature of the invention; rather, it was the ink migration and the extra security feature added to the instrument. In short, the prosecution history does not support defendant's construction of claim 10.

The prosecution history, when examined, is consistent with plaintiff's reading of claim 10. The '283 patent is based upon and relates back to the original patent application that matured into the '315 patent. The '315 patent application states: "Preferably, the form is a multiple copy form including the original check or money order, a voucher, and a customer copy." '315 patent, col. 4, ll. 1–3. Therefore, although a multiple copy form is preferred, the patent discloses a form with at least one sheet of an absorbing type paper, but does not require more. Moreover, claim 36 of the originally filed application disclosed "a form ... comprising at least one sheet of an absorbing type paper," Original filed Claim of '315 patent. Thus even the previous incarnation of claim 10 in the '283 patent contained the same minimal requirement that the form set have at least one sheet of absorbing type paper, but not more. Claim 10 preserves the same minimal wording, without requiring additional sheets of paper. The prosecution history therefore discloses a form set that, at a minimum, has one sheet, but does not require more.

Defendant's final contention is that persons in the form industry distinguish between "forms" and "form sets" depending on whether more than one sheet is used or not. According to defendant, one-sheet forms containing a separable receipt are not called form sets by persons in the form industry. Thus, defendant concludes that a form set has two or more sheets, with one sheet placed under the other and identical imprinting on each sheet. Defendant relies on Postal Service Contract No. 104230–90–B–20235 with Moore Business Forms, Inc. Extrinsic evidence, such as this contract, may be utilized if the intrinsic evidence (claim language, specification, and prosecution history) are ambiguous. *Vitronics*, 90 F.3d at 1584. Assuming, *arguendo*, such were the case, the contract does not provide the clarification that defendant reads into it. Whereas defendant can point to provisions that define postal money orders as "single-part continuous forms" and an exemplar showing two parts (or sides), plaintiff can point to other provisions in the same contract that use "forms" and "form set" interchangeably. For example, "Form Set Type" Type VI, is a one-part money order consisting of a face and back. This contract does not resolve an ambiguity; rather, it could be said to be ambiguous itself, although the court reads it as including the specifically identified one-part form.

In the case at bar, the patentee has defined "form set" in claim 10 to claim a single sheet. Because the definition of "form set," as defined by the plain language of claim 10, governs the use of that term in claim 10 and its dependent claims, the term "form set," for the purposes of the '283 patent, includes single-ply forms.

### 2. *"Negotiable instrument"*

■ The parties dispute the meaning of the term "negotiable instrument" as used in

**3.** The '283 patent claims were allowed, with the exception of application claim 2, which is of no importance to this case.

the patent claims. Plaintiff contends that the term "negotiable instrument" includes money orders. Defendant contends that it does not.

The prosecution history supports plaintiff's reading of the patent claim. The '283 patent is a continuation-in-part of the parent application, USSN 418,670, which matured into patent '315. The '315 patent discloses an imprinter that is used as a check writer for printing "checks, money orders, or other negotiable instruments." '315 patent, col. 3, ll. 47–48. The prosecution history of the '283 patent therefore defines a money order as a type of negotiable instrument.

The ordinary meaning of "money order" also supports plaintiff's construction of the claim term. *Webster's Third New International Dictionary* 1459 (3d ed.1981), defines money order as "an order for the payment of money, specif[ically]: an order issued at a post office upon application by a person making a remittance and payable at another post office." *Webster's Third* defines "negotiable" as "that [which] can be negotiated" or "that [which] can be transferred or assigned from one person to another in return for equivalent value by being delivered either with endorsement ... or without endorsement ... so that title passes to the transferee ...." *Id.* at 1514. These definitions indicate that the ordinary meaning of the term "negotiable instrument" includes money orders and checks.

During the prosecution of the '283 patent, the PTO rejected parts of the application as prior art pursuant to 35 U.S.C. § 103 (2002). The PTO cited four patents as constituting prior art, including Chang and U.S. Patent No. 4,936,607 (issued Jun. 26, 1990) ("Brunea"). Chang states: "The negotiable instrument may be a bank check, money order, bill of exchange, certificate of deposit, treasury check, cashier's check, traveler's check, letter of credit, warrant, airline ticket, contract, deed, securities, certificates identification card, etc." Chang, col. 1, ll. 26–30. Brunea describes a "money order or other valuable document to be protected from forgery," Brunea, col. 3, ll. 12–14, thus equating money orders with negotiable instruments. Thus, plaintiff concludes, those working in

the art used the term "negotiable instrument" to include money orders.

Defendant takes the position that the claim term "negotiable instrument" does not encompass all money orders. A negotiable instrument, as defendant describes it, is a document that has been filled out and that is capable of being legally transferred from one person to another either by delivery or by delivery and endorsement so that title passes to the transferee. Although the specification in Chang redefined the term "negotiable instrument" for the purposes of that patent, defendant argues that nothing indicates that the '283 patentee incorporated the Chang usage into the '283 patent. Further, defendant notes that the Uniform Commercial Code (the "UCC") does not categorize money orders as negotiable instruments. *Lewin v. United States,* 145 Ct.Cl. 249, 251, 170 F.Supp. 646, 648 (1959) (holding that money orders not negotiable instruments, so UCC does not apply).

The court does not agree that the '283 patent uses the term "negotiable instrument" in the technical sense embodied in the UCC. The person of ordinary skill in the art is one familiar with printing, not article 3 of the UCC. Moreover, plaintiff has not argued that the '283 patent incorporates Chang—only that Chang represents how a person of ordinary skill in the art understood the term "negotiable instrument" at the time the '283 patent was being prosecuted. Chang—and to a lesser extent Brunea—indicate that persons of ordinary skill in the art used the term "negotiable instrument" to denote a broad category of forms that include money orders. This definition is in agreement with the prosecution history, the ordinary meaning of the term, and the prior art that was before the PTO at the time the '283 patent was being prosecuted.

### 3. *"Character perimeter surface"*

■ The parties disagree about the meaning of "character perimeter surface" as used in claims 6 and 10. Claim 6 discloses the following limitations: "A form set according to claim 5 wherein the total character face lateral migration of the indicia from any *character perimeter surface* ... being no

greater than about 0.012 inches." '283 patent, col 17, ll. 37–41 (emphasis added). Claim 10 discloses the limitations as follows:

> an imprinting mechanism ... for imprinting negotiable instruments with characters ... each of said characters having a *character perimeter surface* ... the total character face lateral migration of the ink from any *character perimeter surface* on either surface of the sheet being no greater than about 0.012 inches.

'283 patent, col. 18, ll. 5–22 (emphasis added).

Plaintiff asserts that the term "character perimeter surface" is "the appearance of indicia of an imprinted numeral or printed indicia as being the edge of the visually appearing imprinted character." Pl.'s Br. filed July 31, 2002, at 21. Plaintiff's interpretation embraces both closed plane imprints and broken plane characters. Defendant contends that the description of "character perimeter surface" in the specification and drawings confirms the requirement for a closed plane or solid figure with unbroken edges. According to defendant, the claim language requires a closed plane figure, which defendant describes as a structure corresponding to characters, all of which contain perimeter surfaces.

The term "perimeter" has a number of ordinary meanings. One dictionary offers the following definition: "1. **a:** the boundary of a closed plane figure **b:** the length of a perimeter 2: a line or strip bounding or protecting an area 3: outer limits." *Webster's Ninth New Collegiate Dictionary, supra,* at 874. Alternatively, "perimeter" is defined as: "1. **a.** *Math.* A closed curve bounding a plane area. **b.** The length of such a boundary. 2. A fortified strip or boundary usually protecting a military position. 3. The outer limits of an area." *American Heritage Dictionary, supra,* at 922. A final dictionary defines "perimeter" as: "[Math] The total length of a closed curve; for example, the perimeter of a polygon is the total length of its sides." *McGraw–Hill Dictionary of Scientific and Technical Terms* 1188 (2d ed.1978).

A claim term's ordinary meaning controls unless the intrinsic evidence clearly redefines the claim term so as to put one reasonably skilled in the relevant art on notice that plaintiff intended to assign the term a different meaning. *See Bell Atlantic,* 262 F.3d at 1268. "Because words often have multiple dictionary definitions, some having no relation to the claimed invention, the intrinsic record must always be consulted to identify which of the different possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor .... If more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms may be construed to encompass all such consistent meanings." *Texas Digital,* 308 F.3d at 1203 (internal citations omitted).

The court concludes that the ordinary meaning of perimeter embraces broken plane characters. Of the nine definitions of "perimeter" quoted above, only three require a perimeter to surround a closed figure. In two of the three cases, the dictionary in question annotated the definitions as mathematical terms, suggesting that those definitions differ from the non-mathematical, non-technical meaning of the word (indeed, one of the sources was a dictionary of scientific and technical terms). Nothing in the '283 patent indicates that the patentee intended to use the term "perimeter" in its mathematical sense. The invention also does not require that one use such a definition. Given the above, neither the specification nor the prosecution history justifies departing from the ordinary meaning of the claim language to require a closed plane figure. The ordinary meaning of perimeter dictates that "character perimeter surface," as used in claim 10, should include both closed plane and open plane characters.

The '283 patent specification does not alter the ordinary meaning of the term "perimeter." The specification identifies the characters that are imprinted by labeling the character face (33a) which is bound by two peripheral edges (33b and 33c, respectively). '283 patent, col. 8, ll. 26–38, Fig 4B.

## FIG. 4B

These character face peripheral edges define the "character perimeter surface," as disclosed in claims 6 and 10, which plaintiff contends create the indicia of an imprinted character.

However, "[t]hat a specification describes only one embodiment does not require that each claim be limited to that one embodiment." *SRI Int'l, Inc. v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 n. 14 (Fed.Cir. 1985) (cited with approval in *Texas Digital*, 308 F.3d at 1204–05). Therefore, the diagram of a character perimeter surface in the specification cannot be conclusive on the question of how the patentee chose to define "perimeter."

Defendant argues that the plain language of claims 6 and 10 supports its reading of the patent disclosure. Defendant contends that while claim 6 discloses "any character perimeter surface," claim 10 discloses "a character perimeter surface," therefore requiring that the character face be a solid plane. Defendant's reading of the claim language is not persuasive. The plain language of the patent does not require a closed plane, and the grammatical difference between claims 6 and 10 does not result in the semantic difference that defendant alleges. The claim language merely changes from "any" to "a" when describing how the ink migrates from the imprinted area, but it does not assert a change in the quality of the character, let alone require something as specific as a closed plane character.

Defendant also maintains that its reading of claim 10 is more consistent with other limitations in the patent. First, claim 14, which is dependent on claim 10, requires that the "integrity" of the character face be preserved. '283 patent, col. 8, ll. 41–42. Defendant resorts to a dictionary definition of "in-

tegrity," which is "the quality or state of being complete or undivided." *Webster's Ninth New Collegiate Dictionary, supra*, at 628, *American Heritage Dictionary, supra*, at 667–68. In order for the character perimeter surface to be "preserved," under defendant's definition of the claim language, the faces of the characters must be complete or undivided before ink bleed begins, which suggests closed plane characters. Defendant therefore contends that the "character perimeter surface" in claim 10 must exist as a closed plane or solid figure with unbroken edges before ink bleed begins.

Second, the patent also contains a limitation that the ink's lateral migration be no greater than about 0.012 inches. Defendant interprets the closed plane surface as the point from which the imprinting ink migrates laterally and from which the lateral migration is measured. However, a closed plane surface is not necessary to measure the lateral migration of the ink; it just as easily can be measured from the area where the imprint was made, be it a closed plane surface or open plane figure. This reading of the patent claim is consistent with the requirement of claim 14 that the character face be "preserved." Preservation of a character face does not require that it be a closed plane, but that the character face not be mutilated from its original form. In the case of an open plane character, the patent claim would require that the original broken planes be preserved as they had been upon imprinting. Thus, even a broken plane character face can be preserved as a recognizable imprinted character. Defendant applies dictionary definitions beyond their competency. The court will not read a further limitation into the claim that does not exist when the

claim does not disclose that the character surfaces must be closed planes.

In no respect does the plain language of the patent require that the imprinted character be closed plane; rather, it calls for a perimeter surface that is preserved as such even after the ink bleeds through the instrument sheet. While the perimeter of a character can be drawn around closed or open plane figures, it merely must bind the outer limits of the figure. The effect would be the same even if the character surface were uneven; the perimeter would bind the outer limits of the character, and the ink bleed would be measured from that boundary. Consistent with these requirements, the character itself may be a closed plane character or a broken plane character.

Defendant argues that the patent specification also supports its reading of claim 10. The specification states that the present invention includes an imprinter, and "[e]ach of the characters has a character perimeter surface." '283 patent, col. 2, ll. 51–52. Because the sentence lists the character perimeter surface as a separate requirement, defendant contends that the surface is not merely an intended result. While the court agrees that the claim sets forth character perimeter surface as a separate requirement, it does not follow that this surface must be a closed plane. As explained above, a perimeter can exist around either a broken or closed plane character. The specification therefore does not support defendant's reading.

Defendant also cites the patent's prosecution history, noting that the PTO required that the nature of the intended imprinting not be considered a limitation on the structure. Defendant asserts that the character face and its attributes were used to overcome the rejection of the intended printing as a limitation, as well as to distinguish prior art. '283 patent, col. 2, ll. 51–52. Defendant's assertion is mere conjecture. Defendant does not cite the PTO correspondence that supports this argument, and the court can find none. The court can accord this aspect of the prosecution history no weight.

## CONCLUSION

Accordingly, based on the foregoing,

IT IS ORDERED, as follows:

1. For the purposes of the claim-in-suit, the following terms shall be construed as follows: "Form set" includes single-ply instruments; "negotiable instrument" includes money orders; and "character perimeter surface" includes both closed and broken plane figures.

2. By December 16, 2002, the parties shall file a Joint Status Report detailing a proposed course of further proceedings and a schedule therefor.